## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**TINA LOUISE BURTON,**

     **Plaintiff,**

**v.**                         **Case No.: 3:20-cv-00794**

**KILOLO KIJAKAZI,**
**Acting Commissioner of the**
**Social Security Administration,**

     **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are Plaintiff's Brief in Support of Judgment on the Pleadings, and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 11, 12).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the

pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.   <u>Procedural History</u>

In October 2018, Tina Louise Burton ("Claimant") protectively filed for SSI, alleging a disability onset date of January 1, 2018. (Tr. at 84, 144, 282). She also filed an application for DIB in November 2018, alleging that she became disabled on September 15, 2018. (Tr. at 84, 280). Claimant asserted that she could not work due to "lymphoedema in legs, arthritis in knees, trouble breathing, depression, and cellulitis." (Tr. at 317). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 84). Claimant then filed a request for an administrative hearing, which was held on March 11, 2020 before the Honorable Howard Wishnoff, Administrative Law Judge. (Tr. at 101-42). By written decision dated July 1, 2020, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 81-100). The ALJ's decision became the final decision of the Commissioner on November 20, 2020 when the Appeals Council denied Claimant's request for review. (Tr. 1-7).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 9, 10). Claimant filed a Brief in Support of Judgment on the Pleadings, and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 11, 12). The time period within which Claimant could file a reply to the Commissioner's response expired. Consequently, the matter is fully briefed and ready for resolution.

## II.   **Claimant's Background**

Claimant was 43 years old on her alleged onset date and 45 years old on the date of the ALJ's decision. (Tr. at 94). She communicates in English, has the equivalent of a high school education, and previously worked as a babysitter and housekeeper. (Tr. at 137, 316, 318).

## III.   **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c).

Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2019. (Tr. at 86, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since September 15, 2018, the alleged disability

onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: dysfunction of the right knee, diabetes mellitus, chronic obstructive pulmonary disease (COPD), obstructive sleep apnea (OSA), obesity, and depressive/bipolar disorder. (Tr. at 86, Finding No. 3).

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 87-89, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can occasionally climb ramps and stairs, and can occasionally balance, stoop and crouch, but could never climb ladders, ropes, or scaffolds, could never kneel and could never crawl. The claimant can never work at unprotected heights or with moving mechanical parts, and can tolerate only occasional exposure to humidity and wetness, dusts, odors, fumes, and pulmonary irritants and to extremes of heat and cold. The claimant is capable of performing simple, routine tasks, and can have frequent interaction with supervisors, co-workers, and members of the public.

(Tr. at 89-94, Finding No. 5).

At the fourth step, the ALJ determined that Claimant could not perform her past relevant work. (Tr. at 94, Finding No. 6). Therefore, the ALJ reviewed Claimant's prior work experience, age, and education in combination with her RFC to determine her ability to engage in other substantial gainful activity. (Tr. at 94-95, Findings 7 through 10). The ALJ considered that (1) Claimant was born in 1975 and was defined as a younger individual age 18-44 on her alleged disability onset date; (2) Claimant had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of her transferable job skills. (Tr. at 94-95, Findings 7

6

through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert ("VE"), the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including work as an addresser, document preparer, and office clerk. (Tr. at 95, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 96, Finding No. 11).

## IV.   __Claimant's Challenges to the Commissioner's Decision__

Claimant states that her sole challenge in this case is that the Commissioner's decision is not supported by substantial evidence because the ALJ disregarded the VE's testimony that Claimant would not be retained by an employer if she was absent from work three or more days per month or off-task 15 percent or more of the workday. (ECF No. 11 at 5). Although Claimant identifies only one challenge concerning the VE's testimony, she further states that the ALJ erred in evaluating her subjective symptoms and RFC to perform a limited range of sedentary work. (*Id.* at 6-7).

In response, the Commissioner argues that Claimant's assertions are nothing more than an impermissible request for the Court to reweigh the evidence and substitute it's judgment for that of the ALJ. (ECF No. 12 at 15). The Commissioner maintains that substantial evidence supports the ALJ's finding that Claimant was not disabled under the Act, and the ALJ properly took into account Claimant's subjective complaints, assessed Claimant's RFC, and considered the VE's testimony. (*Id.* at 12-20).

## V.   __Relevant Evidence__

The undersigned has reviewed all of the evidence before the Court. The information that is most pertinent to Claimant's challenges is summarized as follows:

### A. Treatment Records

On September 19, 2018, Claimant was prescribed compression wraps for lower extremity lymphedema. (Tr. at 431-32). The bandages effectively reduced the swelling, but Claimant stopped attending scheduled appointments at the lymphedema clinic on October 16, 2018 and was discharged from treatment. (Tr. at 449, 460). Claimant complained of knee pain to Jeff Beals, PA-C, on February 7, 2019. (Tr. at 547). She explained that she experienced right knee pain for years, but her left knee was also starting to "bother" her. (*Id*.). Claimant was wearing a brace and stated that the right knee injection that she received did not help. (*Id*.). She had not attended physical therapy. (*Id*.). Claimant had antalgic gait, but no edema; normal reflexes and strength; and intact sensation. (*Id*.). PA-C Beals diagnosed Claimant with borderline severe osteoarthritis in her right knee. (Tr. at 548).

On March 1, 2019, Claimant presented to Zachary Moore, APRN, FNP-BC, concerning right lower leg pain. (Tr. at 715). Her edema was much improved, and she had lost 25 pounds since her previous visit. (*Id*.). On examination, Claimant had normal breath sounds without wheezing or rhonchi, no dizziness or localized swelling in her lower leg, and normal cardiovascular findings. (Tr. at 716-17). She received bilateral Monovisc injections in her knees five days later. (Tr. at 638). X-rays on July 19, 2019 reflected moderate degenerative changes in Claimant's left knee and moderate osteoarthritis in her right knee. (Tr. at 635, 637).

Claimant reported anxiety and depression to Michael P. Hackman, M.D., on August 7, 2019. (Tr. at 727). She claimed that she had experienced depression since she was 13 years old, but denied ever being hospitalized for mental health issues. (*Id*.). Claimant stated that she used to rub an eraser on her legs to harm herself, but she had

not done so in more than one year. (Tr. at 727). Dr. Hackman recorded that Claimant responded well to several antidepressants in the past but was not consistently taking her medication. (Tr. at 728). He enrolled Claimant in individual counseling and advised her to use a phone application to remind her to take her medication. (*Id.*).

A genicular nerve block was administered in Claimant's right knee on September 12, 2019.  (Tr. at 620). On September 18, 2019, Claimant presented as a new patient to Olivia Mooney, FNP-C. (Tr. at 619). Claimant stated that the nerve block provided ten percent pain relief. (*Id.*). She reported that she had suffered from knee pain since 2013, and it was exacerbated by activities such as standing, walking, and bending her knee. (Tr. at 619). Claimant alleged that she could not stand for very long. (*Id.*). Nurse Mooney noted that Claimant's physicians recommended conservative treatment for her knee pain, including weight loss. (*Id.*). Claimant was obese at 355 pounds, and she had tenderness in her right knee, but she was well developed, nourished, and in no acute distress; demonstrated stable behavioral patterns and relevant, coherent speech with average fluency; her respirations were unlabored and neurological functions were intact; and she stood and walked unassisted with non-antalgic gait. (Tr. at 618). Nurse Mooney prescribed Flector patches for Claimant's knee pain. (Tr. at 619).

Claimant was hospitalized from October 11 through 18, 2019 due to "acute on chronic" hypoxic/hypercapnic respiratory failure with possible obstructive sleep apnea/hyperventilatory syndrome. (Tr. at 594). She was prescribed a BiPap machine and oxygen tank. (*Id.*). Claimant was advised to quit smoking and scheduled for outpatient sleep and pulmonary function studies. (*Id.*). She reported on November 7, 2019 that she was feeling better since discharge from the hospital. (Tr. at 586). Claimant had some generalized weakness; however, her shortness of breath and cough were improved, and

she felt better overall. (Tr. at 586). Claimant admitted that she did not always use her BiPap at night per instructions. She also did not always use her inhaler twice per day, as prescribed, but did use it at least once per day. (*Id.*). Claimant completed her courses of antibiotics and steroids and used her supplemental oxygen continuously during the day, and she also used it at night if she did not wear her BiPap. (*Id.*). On examination, Claimant's breath sounds were diminished, but her lungs were clear to auscultation, and she showed no signs of increased respiratory effort or signs of respiratory distress. (Tr. at 590). Claimant was morbidly obese at 350 pounds with 1+ pitting edema in her ankles, but she was in no acute distress, her gait and station were normal, and she was oriented in all spheres with normal mood and affect. (Tr. at 590). Claimant's pulmonary function study on January 13, 2020 showed mild restrictive impairment. (Tr. at 581).

Claimant followed up with Nurse Mooney on January 16, 2020. (Tr. at 578). She stated that she used the Flector patches for two weeks, but they did not seem to help. (*Id.*). She was obese, weighing 364 pounds at five feet three inches, and she had tenderness in her right knee, but she was well developed, nourished, and in no acute distress; demonstrated stable behavioral patterns and relevant and coherent speech of average fluency; her respirations were unlabored and neurological functions were intact; and she stood and walked unassisted with non-antalgic gait. (Tr. at 579). Nurse Mooney diagnosed Claimant with right knee bursitis and bilateral knee pain and osteoarthritis. (Tr. at 580). She recommended a bursa injection in Claimant's right knee. (*Id.*). Shortly thereafter, on January 20, 2020, Claimant completed a six-minute walk test. (Tr. at 567). Her oxygen saturation was 96 percent on room air at rest, but she required two liters of continuous oxygen to maintain oxygen levels above 88 percent while walking 120 meters in six minutes. (*Id.*).

### B. *Evaluations and Prior Administrative Findings*

On February 7, 2019, state agency physician Dominic Gaziano, M.D., assessed Claimant's RFC based on his review of Claimant's records. Dr. Gaziano concluded that Claimant could perform work at the light exertional level with occasional postural activities except that she could never climb ladders, ropes, or scaffolds or crawl and should avoid concentrated exposure to extreme cold; fumes, odors, dusts, gases, and poor ventilation; and hazards. (Tr. at 150-51, 163-64). Palle Reddy, M.D., affirmed Dr. Gaziano's findings on June 13, 2019. (Tr. at 177-79, 190-92).

Consultative psychologist Tara Bias, M.A., performed a mental status examination of Claimant on February 21, 2019. Claimant reported that she went to the store and ate outside of the home twice per week, ran errands once per week, visited family and friends twice per month, used the phone daily, and went to the movie theater on special occasions. (Tr. at 554). She attended medical appointments as scheduled; independently performed living skills, such as showering every other day; completed housework, including laundry, dishes, and sweeping; cared for animals; and watched television. (*Id.*). During the evaluation, Claimant exhibited depressed mood and tearful affect, but she was casually dressed with fair hygiene and grooming and was "quite friendly and cooperative." (Tr. at 553). She maintained good eye contact, was oriented in all spheres, and her speech, thought processes, thought content, immediate memory, concentration, persistence, and pace were all within normal limits. (Tr. at 553-54). Claimant had fair insight and mildly deficient judgment, psychomotor behavior, and recent and remote memory based on her responses to Ms. Bias's questions. (Tr. at 553). Her social functioning was moderately impaired during the evaluation. (Tr. at 554). Ms. Bias diagnosed Claimant with major depressive disorder and somatic symptom disorder with predominant pain. (*Id.*).

11

On March 15, 2019, state agency psychologist John Todd, Ph.D., assessed, based on his review of Claimant's records, that Claimant had no limitation maintaining concentration, persistence, or pace; mild limitation understanding, remembering, or applying information and adapting or managing herself; and moderate limitation interacting with others. (Tr. at 148, 161). Dr. Todd found that Claimant's mental functions were not significantly limited other than her moderately limited ability to work in coordination with or in proximity to others without being distracted by them, interact appropriately with the general public, and get along with coworkers. (Tr. at 152-53, 165-66). Jeff Boggess, Ph.D., affirmed Dr. Todd's findings on June 11, 2019. (Tr. at 176, 179-81, 189, 192-94).

### C. Claimant's Testimony

Claimant testified during her administrative hearing on March 11, 2020 that she weighed around 360 pounds because she regained some weight after quitting smoking. (Tr. at 119). In terms of respiratory impairments, Claimant stated that she used inhalers and supplemental oxygen, but she wheezed when she moved around and sometimes while sitting down. (Tr. at 115-16). Claimant testified that she could bathe and dress herself, but she had to use oxygen right afterward. (Tr. at 121). She could cook and drive, but she only drove short distances due to dizziness, and she shopped for groceries and clothes using "one of the little carts." (Tr. at 122-23). Claimant stated that she needed help to do housework. (Tr. at 125-26). She asserted that she was generally more comfortable sitting down, but she moved her legs every few minutes so they would not "get stiff and hurt worse." (Tr. at 124). Claimant explained that her "issues" were mostly in her right knee. (*Id.*). She related that she received steroid shots, and the pain center gave her pain patches, but neither treatment worked. (Tr. at 124-25). Claimant said that her providers

did not want to prescribe pain medication because it "would not work," and they told her to try to deal with the pain the best that she could. (Tr. at 125). Claimant alleged that she was in constant pain, particularly when she tried to bend her knees, and her pain averaged between seven and eight on a ten-point scale. (Tr. at 128).

## VI.   **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is

13

supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.   <u>Discussion</u>

Claimant challenges the ALJ's subjective symptom analysis and RFC finding, including the ALJ's consideration of the VE's testimony. Each argument is considered below, in turn.

### A. *Subjective Symptoms*

Claimant argues that the ALJ's "credibility finding" is flawed because the objective medical evidence supports her allegations concerning the intensity, persistence, and limiting effects of her symptoms. (ECF No. 11 at 5-6). Under the applicable Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. §§ 404.1529, 416.929 (effective March 27, 2017). First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016). Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

14

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7.

SSR 16-3p provides further instruction on what type of evidence should be considered when the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence. SSR 16-3p, 2016 WL 1119029, at *6. The ruling presents an extensive list of evidence that may prove probative and notes that valuable evidence to consider may include (1) a longitudinal record of any treatment and its success or failure, including any side effects of medication and (2) indications of other

impairments, such as potential mental impairments, that could account for an individual's allegations. *Id.*

In *Hines v. Barnhart*, the Fourth Circuit stated that:

Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person;" rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit

16

the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for that of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

In this case, the ALJ performed the two-step process. After considering the evidence, the ALJ concluded that Claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms. (Tr. at 92). However, the ALJ found that Claimant's statements concerning the intensity, persistence, and limiting effects of the symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (Tr. at 92-93).

First, the ALJ noted that Claimant's activities and capabilities were greater than expected of someone suffering from disabling impairments. (Tr. at 93). For instance, Claimant drove a car, watched television, played games on her phone, shopped twice per week, ran errands once per week, visited family or friends twice per month, cared for pets, showered, folded clothes, washed dishes, and swept. (Tr. at 88-89).

The ALJ considered the medical evidence concerning Claimant's lower extremity lymphedema, knee arthritis, breathing impairments, obesity, mental impairments, and

other issues. He noted that Claimant was diagnosed with lower extremity lymphedema in September 2018 and effectively treated with compression bandaging and therapy. (Tr. at 90). In November and December 2018, Claimant complained of swelling, but conceded that she was only wearing her compression leggings intermittently and had not followed up with the lymphedema clinic since October because her insurance "ran out." (*Id.*). Despite discontinuing that treatment, Claimant had no edema in February, March, or October 2019. (Tr. at 91).

Regarding Claimant's knee impairments, the ALJ discussed that x-rays showed arthritis in Claimant's knees that was borderline severe in her right knee, and she had bilateral moderate tricompartmental joint space loss with osteophytosis. (Tr. at 90-92). The ALJ considered that Claimant quit physical therapy secondary to pain, but received injections, a nerve block in her right knee, and was referred to pain management. (Tr. at 91). She was encouraged to lose weight, as her body mass index was over 60. (Tr. at 91, 93). The ALJ noted that in February 2019 Claimant had antalgic gait, but full range of motion and intact strength and reflexes in her extremities. (*Id.*). Further, she had non-antalgic gait in September 2019. (*Id.*).

The ALJ also considered Claimant's asthma, sleep apnea, and COPD, but noted that pulmonary function testing in January 2019 and 2020 showed only mild restrictive disease, although Claimant continued to smoke. (Tr. at 91, 92). During a six-minute walk test in January 2020, Claimant required two liters of continuous supplemental oxygen to maintain oxygen saturations above 88 percent while walking 120 meters in six minutes. (Tr. at 92). However, Claimant's oxygen saturation was 96 percent at rest without any supplemental oxygen. (*Id.*).

The ALJ further noted Claimant's diagnoses of depression/bi-polar disorder,

somatic symptom disorder, and adjustment disorder with anxiety. (Tr. at 86, 92). The ALJ found that Claimant had some moderate mental functional limitations, but she responded well to several different antidepressants, although she was inconsistent in filling her medications. (Tr. at 88-89, 92). Finally, the ALJ thoroughly considered Claimant obesity and evaluated the persuasiveness of the prior administrative findings. (Tr. at 87, 91-94).

Overall, the ALJ noted that Claimant's consistent pattern of obesity, documented in conjunction with her complaints of knee pain and mild findings of COPD, supported to some extent her subjective complaints of knee pain. (Tr. at 93). However, the ALJ cited that Claimant had continued to smoke, and, despite her complaints of pain, she refused physical therapy or weight loss regimes. (*Id.*). The ALJ concluded that, while the evidence did not reflect that Claimant's impairments were disabling, her mild arthritis, breathing issues, and obesity restricted her to a reduced range of sedentary work, and her mental impairments limited her to performing simple, routine tasks with frequent interaction with others. (*Id.*).

Claimant does not identify any flaw in the ALJ's subjective symptom analysis. Rather, she simply lists her own testimony and a few pieces of medical evidence and asks the Court to review it and reach a different conclusion than the ALJ. (ECF No. 11 at 5-6). The only medical evidence that Claimant references in her brief concerns mild restrictive disease, mental diagnoses, and obesity. (*Id.* at 6, 7). The ALJ considered that evidence and provided well-reasoned support for his analysis of it. Furthermore, in accordance with SSR 16-3p, the ALJ did not impermissibly evaluate Claimant's truthfulness or character, but specifically compared Claimant's allegations to the evidence of record to evaluate her subjective complaints.

While Claimant believes that the evidence incontrovertibly substantiates her allegations, there is undoubtedly more than a scintilla of evidence to support the ALJ's finding that Claimant's impairments were not debilitating. Although Claimant disagrees with the ALJ's analysis and conclusions, she does not identify any material conflicting evidence that the ALJ failed to consider or any misstatement of the evidence of record. Claimant asks the Court to reweigh the evidence and find her disabled. However, as previously explained, the Court cannot substitute its judgment for the ALJ. *Hays*, 907 F.2d at 1456. Rather, the Court can only scrutinize the evidence to determine if it is sufficient to support the ALJ's conclusions. In this case, that standard is unequivocally met. As shown above, the ALJ properly considered Claimant's statements, her daily activities, and the medical evidence to evaluate the intensity, persistence, and severity of Claimant's reported symptoms. Claimant offers nothing to rebut the ALJ's well-reasoned conclusions and specific citations to the record. Therefore, the undersigned **FINDS** that substantial evidence supports the ALJ's subjective symptom analysis.

### B. RFC

Claimant next argues that the ALJ's "failure to properly consider all of [her] impairments and the severity of the same renders the [RFC] analysis fatally flawed." (ECF No. 11 at 6). She contends that the ALJ did not fairly and reasonably address the vocational impact of her "objectively documented limitations" related to mild restrictive disease and mental impairments. (*Id.*). In addition, Claimant argues that the ALJ erred in concluding that she could perform sedentary work, and the ALJ should have meaningfully considered SSR 96-9p, as well as her obesity under SSR 19-2p. (*Id.*). According to Claimant, sitting for six hours in an eight-hour workday is "out of the question" due to her obesity. (*Id.* at 7).

SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3.

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." *Id.* Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4. In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7.

While an ALJ is not required to explicitly discuss "irrelevant or uncontested" functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

As previously discussed, the ALJ thoroughly considered Claimant's allegations, treatment records, objective findings, test results, daily activities, and the prior administrative findings. Claimant does not identify any relevant functions or evidence that the ALJ overlooked in assessing her RFC, nor does she identify inadequacies in the RFC discussion that frustrate meaningful review. Claimant emphasizes her claimed inability to sit for six hours in a workday and the vocational impact of her obesity. However, the ALJ specifically considered those factors. (Tr. at 87, 91-93). The ALJ noted that Claimant's restrictive impairment was mild; she did not require supplemental oxygen at rest; her lower extremity edema resolved; she had full muscle strength, negative straight leg raising tests, and normal reflexes; and she had normal and mild mental limitations on examination other than moderately deficient social interaction. (Tr. at 88-89, 91-92). In addition, the ALJ considered Claimant's daily activities and the prior administrative findings. (Tr. at 88-89, 93-94). The ALJ was persuaded by the psychologists' findings, but he concluded that Claimant was even more physically limited than the range of light work that the state agency physicians assessed due to her obesity and other limitations. Ultimately, the ALJ found that Claimant could perform a very limited range of sedentary work.

Claimant proposes that the Court independently review the record and determine

that she is not capable of working at any exertional level. However, the role of the Court is not to second-guess the ALJ's RFC assessment, but to review it, along with the record, to determine if the ALJ correctly applied the law and the decision is supported by substantial evidence. In this case, the record supports the ALJ's analysis, and Claimant fails to identify any specific errors in the RFC finding. She simply cites legal standards and makes conclusory assertions without applying the law to the facts of her case. For instance, Claimant asserts that she cannot sit for six hours in a workday, but she does not argue that the ALJ failed to evaluate that functional ability, nor does she point to any contrary evidence that the ALJ failed to consider. The Court cannot independently assess a claimant's functional abilities on judicial review. In this case, there exists more than a scintilla of evidence to support the ALJ's assessment that Claimant can perform a reduced range of sedentary work despite her obesity, knee pain, breathing impairment, and other impairments.

It is evident, here, that the ALJ considered the relevant evidence and articulated a cogent, well-supported RFC assessment with specific citations to the record. The ALJ considered the evidence cited by Claimant, and all other evidence, in determining Claimant's RFC. Therefore, the undersigned **FINDS** that the ALJ's RFC assessment is supported by substantial evidence.

### C. VE Testimony

Finally, Claimant argues that the ALJ "should have accepted the testimony of the [VE] who stated that [Claimant] would not be retained by an employer if she was absent from work 3 or more days a month or was off-task 15% or more of the normal workday." (ECF No. 11 at 7). She contends that a "fair review of the evidence including [her] testimony reflects that [she] would exceed acceptable tolerances and is therefore

23

incapable of substantial gainful activity." (*Id.*).

In order for a VE's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993); *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and mental impairments into an RFC that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). "[I]t is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart*, 181 F. App'x 359, 364 (4th Cir. 2006). A hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted); *see also Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) (noting that hypothetical question "need only reflect those impairments supported by the record"). However, "[t]he Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that jobs exist in the national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities." *Morgan v. Barnhart*, 142 F. App'x 716, 720-21 (4th Cir. 2005).

In this matter, the VE testified that there were no jobs available to a hypothetical individual who was absent from work three or more days per month and/or off-task 15 percent or more of the workday outside of regular breaks. (Tr. at 139). Claimant indicates that the ALJ should have concluded based on that testimony that she was disabled. However, he does not offer any evidence that she would be off-task or absent from work

that frequently. To the contrary, her treatment records did not document any extreme limitations, symptoms, or impairments to the severity that she would be off-task 15 percent of the workday or miss work three or more days per month. Therefore, there was no justification for the ALJ to rely on the VE's response to the hypothetical question concerning an individual with those limitations. Accordingly, the undersigned **FINDS** that the ALJ properly relied on the VE's testimony at steps four and five of the sequential evaluation.

## VIII.  Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 11); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 12); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  October 22, 2021

Cheryl A. Eifert
United States Magistrate Judge